**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **VULCAN COAL AND MINING, LLC,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]          **CV-11-BE-2700-S** |
| | ] |
| **BULK TRADING S.A.,** | ] |
| | ] |
| **Defendant.** | ] |
| | ] |

**<u>MEMORANDUM OPINION</u>**

This dispute about an alleged arbitration agreement is before the court on "Defendant's Motion to Stay Proceedings and Compel Arbitration" (doc. 3); and Defendant's "Motion to Strike" (doc. 15) the affidavits of Dailey, Hudson, Uncein, and Chamblee.  At the parties' request, the court entered a stay in this case for over five months, and the court subsequently lifted that stay at the parties' request; these motions are now ready for court resolution.

For the reasons stated in this Memorandum Opinion, the court finds the motion to strike is due to be DENIED, and the motion to stay and compel arbitration is likewise due to be DENIED.

**<u>Background</u>**

On June 22, 2011, Plaintiff, Vulcan Coal and Mining, LLC, an Alabama corporation, originally filed this action against Defendant, Bulk Trading S.A., a Swiss company, in the Circuit Court for Jefferson County, Alabama, asserting "in equity" the following claims: Count I - demanding judgment for amounts allegedly due and owing on an open account plus interest, attorney fees, and costs; Count II - demanding judgment for "Account Stated," amounts allegedly

due for delivered coal and a trucking bill plus interest, attorney fees, and costs; Count III - demanding judgment for goods sold and delivered, plus interest, attorney fees, and costs; Count IV - demanding judgment for compensatory and punitive damages resulting from Defendant's fraudulent statements made negligently, recklessly, and/or intentionally.

The claims in this suit arose out of coal shipped and sold in March 2011. Those shipments occurred as a result of negotiations between the parties allegedly resulting in an arrangement where Vulcan Coal, the coal broker, would deliver coal from a coal producer, Crimson Minerals, LLC, to barges at Lynn Port in Jefferson County, Alabama. According to the arrangement, those barges would be loaded with coal and then Bulk Trading, the coal buyer, would ship the coal through the port of Mobile to Bulk Trading's customers. Hernando Schneider, of ProTCon, one of Bulk Trading's customers, was involved in the negotiations with Vulcan Coal and Crimson Minerals. The proposed agreement called for supplying coal for six barges per week throughout the year, after a trial shipment.

According to Vulcan Coal, the parties never reached a "meeting of the minds" on a contract, although they circulated drafts among themselves. In the original draft, ProTCon was listed as the buyer and Vulcan Coal was listed as seller. After Bulk Trading became involved in the discussions, another draft replaced ProTCon with Bulk Trading as the buyer but Schneider of ProTCon continued to be involved in contract discussions and served as Bulk Trading's agent or representative.

Thomas Hudson, President of Vulcan Coal, claims that he required Crimson Minerals to be an essential party to the contract, because that company and not Vulcan Coal would be supplying the coal. However, whether Crimson Minerals was an essential party to the agreement

2

between Vulcan Coal and Bulk Trading is in dispute; the affidavits of Vulcan Coal and Crimson

Minerals officials claim that all negotiators understood Crimson Minerals to be an essential

party, while Bulk Trading and ProTCon officials disagree.  One draft of the Agreement includes

handwritten changes that Scott Chamblee of Crimson Minerals proposed, and one of these

changes was the insertion of the name of Crimson Minerals as an additional "seller," along with

Vulcan Coal.  Vulcan Coal signed a subsequent version of the same agreement or proposed

agreement that incorporated many of those changes.  The version Vulcan Coal signed lists

Crimson Minerals as supplier alongside Vulcan Coal as the seller and then classifies both Vulcan

Coal and Crimson Minerals as "Seller."  However, Vulcan Coal claims to have signed this

document with the express understanding that the agreement would not be binding unless and

until Crimson Mineral, the coal supplier, also signed the agreement.

The document upon which Bulk Trading relies as the effective agreement is dated

February 11, 2011.  Although Bulk Trading originally filed the Coal Supply Agreement under

seal (*see* docs. 2 & 6, and the docket entry Order dated July 29, 2011), it has since filed a

redacted version of the Agreement (doc. 51-1) which states in relevant part:

> This Agreement is made the 11th day of February 2011 by and
> between **Bulk Trading SA** "Buyer**"**
>
> And
>
> Crimson Minerals, LLC (Supplier) and Vulcan Coal & Mining (Seller) located in
> Birmingham, Alabama hereinafter referred to as the "Seller."[1]
> Each of the Buyer and the Seller shall be referred to herein individually as a

---

[1] The declarations of both Hernando Schneider, owner of ProTCon, and Edoardo Cairo,
Manager of Bulk Trading's Latin American operations, both acknowledge that the document
Vulcan Coal signed refers to *both* Crimson Minerals and Vulcan Coal as the "Seller."  (Doc. 14,
Ex. A ¶6, Ex. B ¶ 9).

"Party" and together as the "Parties."

The Seller herewith agrees to sell and deliver to the Buyer and the Buyer herewith agrees to purchase and take delivery from the Seller subject to the following terms and conditions:

1.    SOURCE OF COAL AND CONTRACT PERIOD
The coal shall be produced in Alabama, and deliver to barges, as per terms agreed on this Coal Supply Agreement (CSA).  The period of the CSA shall be 12 months starting after 15 working days after completion of 30,000 tons + 10% trial shipment to be loaded with laycan 11-17 March 2011.  Buyer will have those 15 days to confirm if the quality supplied is suitable and will allow to carry on the year contract.

***
3.    DELIVERY AND RISK OF LOSS
Seller shall deliver all coal FOB barge . . . at the facility identified as Lynnport, in Birmingham, Alabama, USA.  Title to and risk of loss for the coal shall pass to Buyer upon same dropping into the barges.

(Doc. 51-1, at 1-2).

16.    ARBITRATION
Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause.  The number of arbitrators shall be three.  The seat of arbitration shall be New York, New York.  The language to be used in the arbitral proceedings shall be English.

(Doc. 51-1, at 7).  The document contains a choice of law provision stating that New York law applies.

The last page of the document includes signature lines for three entities: Bulk Trading S.A.; Vulcan Coal & Mining, LLC; and Crimson Minerals, LLC.  The only signature is that of Thomas Hudson for Vulcan Coal; the other signature lines are blank. According to Chamblee, Crimson Minerals' Managing Member, Crimson Minerals never received, signed, or assented to

4

the proposed agreement.  Bulk Trading never registered to do business in the State of Alabama.

Vulcan Coal claims that despite the lack of a contract, the parties agreed to a trial run of shipments in March 2011.  Crimson Minerals began supplying coal to the barge loading facility at Lynn Port, and provided coal for Bulk Trading's *first* six barges, all loaded by March 3-4, 2011.  According to Vulcan Coal's Complaint as amended, after that date, Bulk Trading did not send six barges per week to transport the coal.  Two weeks after the first six barges had been loaded, only four *additional* barges had arrived for loading instead of the twelve additional (six per week) that the signed document specified. On March 18 and 19, 2011, eight *additional* barges were loaded with coal, but afterwards no new barges arrived to carry Bulk Trading's Coal.  Bulk Trading took possession and title of this coal "FOB barge" at Lynn Port.

During this period, based on Bulk Trading's representations that it needed the coal as soon as possible, Vulcan Coal and Crimson Minerals continued to ship and store coal in anticipation of barges arriving, and also incurred storing costs when the barges did not arrive. Further, when Bulk Trading advised Vulcan Coal on March 24, 2011 that it could no longer use barges but still required coal as its customer was in desperate need, Vulcan Coal offered to transport the coal by truck to Mobile, quoting a price that Bulk Trading accepted.  Vulcan Coal trucked the coal to the port of Mobile where Bulk Trading representatives tested the coal quality before accepting it and allowing the trucks to unload the coal.  The Complaint does not state what happened to the coal after Bulk Trading accepted it and Vulcan Coal unloaded it in Mobile.

No coal has been shipped or sold between the parties except for the "trial" shipments in March 2011.  Indeed, an April 2011 email from Edoardo Cairo of Bulk Trading to Thomas

Hudson of Vulcan Coal and Hernando Schneider of ProTCon refers twice to a shipment at the end of March 2011 as a "trial shipment."  (Doc. 11-1, at 24).

After testing and accepting the coal Vulcan Coal provided to it, Bulk Trading withheld partial payment and stated as the reason that the coal quality was lower than required.  Bulk Trading has not paid for all the coal Vulcan Coal transported to port.

After service of Vulcan Coal's June 22, 2011 Complaint, Bulk Trading removed the case to this federal court on July 28, 2011 based on diversity of citizenship. On that same day, Bulk Training also filed a motion to stay the action and compel arbitration[2] (doc. 3) based upon the arbitration clause in the alleged contract.

On August 11, 2011, Vulcan Coal objected to the motion to stay and compel arbitration (doc. 10), and in support of its objection, Vulcan Coal filed a memorandum (doc. 11) and the affidavits of the following: Hudson, President of Vulcan Coal (doc. 11-1, at 3-26); Dailey, a business associate of Hudson who was involved in the relevant negotiations about the coal sales agreement in question (doc. 11-1, at 14-16); Uncein, who was involved in the relevant negotiations about the coal sales agreement in question (doc. 11-1, at 18); and Chamblee, Managing Member of Crimson Minerals (doc. 11-1 at 20-22).  Bulk Trading replied (doc. 13), and filed evidence in support of its motion (doc. 14).

On September 13, 2011, Bulk Trading filed a "Motion to Strike" (doc. 15) the affidavits of Dailey, and portions of the affidavits of Hudson, Uncein, and Chamblee, asserting that the

---

[2] Although Bulk Trading withdrew this motion and its motion to strike (doc. 15) on March 26, 2012, the court allowed the subsequent re-filing of these motions as well the reinstatement of Vulcan Coal's responses to them.  (Docs. 38, 40, and docket entry Order dated June 1, 2012).

affidavits "are replete with unsupported conclusory statements and inadmissible hearsay and should not be considered as proper evidence."  Vulcan Coal filed a response (doc. 16) to this motion, and Bulk Trading filed a reply (doc. 19).

On September 16, 2011, Vulcan Coal filed "Plaintiff's First Amended Complaint." (Doc. 18).

On October 12, 2011, Bulk Trading filed a request for arbitration concerning this same dispute with the registrar of the London Court of International Arbitration to be held in New York, New York.

In November 2011, the parties filed a joint motion to stay this action so that it could be mediated.  (Doc. 25).  The court granted the motion and entered a stay (doc. 26) which was extended four times (docs. 31 & 35 and Docket Orders dated April 2, 2012 and April 27, 2012). Because mediation was unsuccessful, the court subsequently lifted the stay (doc. 46), and the parties have advised the court that the motions are ready for court resolution.

## MOTION TO STRIKE

In this motion, Bulk Trading requests that this court strike the affidavit of Steve Dailey and portions of the affidavits of Thomas Hudson, Juan Uncein, and Scott Chamblee.

Dailey Affidavit

Bulk Trading objects to this affidavit because Dailey is merely a "business associate" of Hudson rather than an employee of the negotiating companies and lacks any personal knowledge of the facts that he presents.

In his affidavit, Dailey asserts that "[b]eginning in December 2010, *I* was involved in discussions with Mr. Hudson, Hernando Schneider and Juan Uncein regarding the purchase of

7

Alabama Coal." (Doc. 11-1, at 15) (emphasis supplied).   Therefore, Dailey is attesting that he has personal knowledge about the discussions with Hudson, Schneider and Uncein, and he may indeed testify about the discussions in which he participated, regardless of his status as employee or business associate.  Hudson's affidavit acknowledges that Dailey was involved in the Bulk Trading matter as a consultant. Further, the emails attached to the declaration of Bulk Trading's manager, Edoardo Cairo, reflect that Dailey was in the email loop regarding the coal supply negotiations.

The only controlling case that Bulk Trading cites in support of its position, *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007), stands for the proposition that a person cannot testify about what occurred in a meeting she did not attend.  The converse of that proposition is that an affiant may testify about what occurred in negotiations and meetings in which he or she did participate.  Thus, *Corwin* does not support Bulk Trading's argument to the extent it asserts Dailey may not testify to discussions in which he participated because he was not an employee of Vulcan Coal, Bulk Trading, or Crimson Minerals.

Despite Dailey's ability to testify about discussions in which he participated, the court agrees that Dailey's affidavit refers to some matters that appear to be outside the specific discussions and the affidavit provides no clarification about how Dailey obtained that information. However, the court is capable of disregarding objectionable parts of affidavits and notes, in any event, that Dailey's affidavit is repetitive of what is also in other affidavits. Therefore, the court finds that the motion to strike is due to be DENIED as to Dailey's affidavit.

<u>Hudson Affidavit</u>

Hudson is the President of Vulcan Coal and was personally involved in the matters

referenced in his affidavit.  Further, as President, he certainly has access to official company records and documents and can testify about them.  Therefore, the court finds that Bulk Trading's nit-picky objections to certain portions of Hudson's affidavit are not well taken and the motion to strike is due to be DENIED as to that affidavit.  Further, the court notes that it is perfectly capable of disregarding any improper information.

Uncein Affidavit

Contrary to Bulk Trading's assertions, Uncein testified that he was involved in the negotiations about the coal supply contract and, thus, he can testify to what happened during those negotiations.  In fact, Uncein specifies that he is the person who contacted Schneider of ProTCon and also Crimson Minerals about the coal supply agreement or proposed agreement made the basis of this suit.  Therefore, the court finds that Bulk Trading's motion to strike is due to be DENIED as to Uncein's Affidavit.  Further, the court notes that it is perfectly capable of disregarding any improper information.

Chamblee Affidavit

Chamblee, the Managing Member of Crimson Minerals, had discussions with Uncein and Hudson about the proposed coal agreement, reviewed a draft of the proposed agreement, and made some changes to that draft.  He can certainly testify about his discussions with Uncein and Hudson, his review of the draft, and his understanding of the proposed agreement based on those discussions and that review.  Further, Crimson Minerals supplied the coal during the March 2011 trial period and can testify about supplying the coal.  Therefore, the court finds that Bulk Trading's motion to strike is due to be DENIED as to Chamblee's Affidavit.  Further, the court notes that it is perfectly capable of disregarding any improper information in the affidavit.

## MOTION TO STAY AND COMPEL ARBITRATION

The court must next determine whether the motion to compel arbitration is due to be granted.  In support of its motion, Bulk Trading presents a document that it claims is an executed contract between the parties with an arbitration clause.  Bulk Trading asks this court to enforce that clause and send this case to arbitration.  Actually, because Bulk Trading did not wait for this court to rule on the motion to compel arbitration but proceeded to initiate arbitration proceedings prior to a ruling, what Bulk Trading asks now is that this court confirm that this matter is properly subject to the on-going arbitration proceedings before the LCIA.

Vulcan Coal argues, on the other hand, that the arbitration clause is not enforceable for two reasons: (1) the parties never entered into the proposed Agreement containing the arbitration clause, so the arbitration clause never came into force; and (2) Bulk Trading is an unregistered foreign corporation in Alabama, and thus, any alleged Agreement to ship and sell coal in Alabama out of Alabama ports is void.

In the motion to compel arbitration and the response, *both* parties assume that this court has the authority to determine whether the underlying contract ever existed at all. Further, in its motion for extension of time to answer the first amended complaint, Bulk Trading appeared to understand and acknowledge that this court had the authority to make that initial determination:

> It is not in the interest of either party to this action or the court to expend additional resources on litigating the merits of this matter UNTIL this Honorable Court rules on the propriety of BT's Motion to Stay Proceedings and Compel Arbitration and determines WHERE the disputes will be resolved, in arbitration or before this Court.

(Doc. 22, ¶ 7).

However, In Bulk Trading's response to Vulcan Coal's objection to its filing LCIA

10

arbitration proceedings, Bulk Trading's position on this issue is less clear.  In fact, it appears to be an about-face.  In that latter filing, Bulk Trading cites *Rent-a-Center, West, Inc. v. Jackson*, ___ U.S. ____, 130 S. Ct. 2772 (2010), which states that the *arbitrator* properly decides the question of the validity of an arbitration contract.

To the extent, if any, that Bulk Trading cites *Rent-a-Center as* support for sending to the arbitrator the initial decision about whether any contract existed at all, the court does not agree that *Rent-a-Center* supports that action.  In fact, the Supreme Court drew an explicit  distinction between the situation where, as here, a dispute exists about whether the parties had ever reached an agreement at all versus the situation in *Rent-a-Center* where the parties had indisputably reached an agreement but the issue was whether the arbitration agreement was valid and enforceable.  The Supreme Court made clear that *Rent-a-Center* did *not* address the category of cases where the issue was "whether any agreement between the parties 'was ever concluded.'" 130 S. Ct. 2778 n. 2  (citing *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006)). The first matter that this court must decide is not the validity of an arbitration clause in a underlying contract that indisputably exists, but instead, it must decide whether the underlying contract exists at all.

The court finds that the initial question of whether any contract existed at all is one for this court and not the arbitrator.  *See Chastain v. Robinson-Humphrey Co.,* 957 F.2d 851, 853-55 (11th Cir. 1992) (holding that the district court, rather than the arbitrator, must decide the validity of contracts where undisputed evidence shows that one of the parties never signed the contracts and the issue was whether contracts existed at all).

11

*1. The issue whether the underlying contract existed*

The court will proceed to address whether any contract ever existed between the parties. If it did, then the court will compel arbitration and the arbitrator will determine the validity of the contract with the arbitration clause.   If no contract ever existed, then no arbitration clause ever existed either, and the court will not compel arbitration.

Vulcan Coal argues that no contract exists because the contract was not signed and executed by one of the essential parties, Crimson Minerals.  It cites Alabama law for the proposition that a contract is unenforceable if the parties agreed that the contract would not be binding until all essential parties signed it, and if all essential parties did not do so.  *See Mercedes-Benz U.S. Intern., Inc. v. Cobasys, LLC,* 605 F. Supp. 2d 1189, 1204 (N.D. Ala. 2009) (quoting the following language from *Hunter v. Wilshire Credit Corp.,* 927 So. 2d 810, 813-14 (Ala. 2005) which in turn was quoting *Paterson & Edey Lumber Co. v. Carolina-Portland Cement Co.,* 112 So. 245, 249 (Ala. 1927) : "But it is equally well settled that an unsigned contract cannot be enforced by either of the parties, however completely it may express their mutual agreement, if it was also agreed that the contract should not be binding until signed by both of them.").

Bulk Trading argues that a contract does exist, and because that contract contains a choice of law provision stating that New York law governs, it cites New York law.  *See Business Ins. Co. v. World Trade Center Props., LLC,* 467 F.3d 107 (2d Cir. 2006) (stating that to resolve contact-formation disputes, courts must look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds").  As support for its argument that a contract does exist between the parties, it points to Vulcan Coal's signature on the "contract" and

to Vulcan Coal's March 2011 provision of coal consistent with the "contract" as a manifestation of the parties' intentions to enter into a contract. Further, it argues that the "contract" existed between Vulcan Coal and Bulk Trading only, and that Crimson Minerals was not an essential party; the supply agreement between Vulcan Coal and Crimson Minerals was a separate agreement private to those parties.

a.  Choice of Law

The document that Bulk Trading proffers as a contract does include a choice of law provision and specifies that New York law applies. But, to assume that New York law necessarily applies without a preliminary determination that a "meeting of the minds" occurred and that the contract was indeed executed puts the cart before the horse.

"[A] federal court in a diversity case is required to apply the law of the state in which the federal court sits [including] conflict laws prevailing in the state. . . ." *Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 711 (11th Cir. 1985) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941)).  Therefore, the court will follow Alabama law to determine in the first instance whether a contract exists and what choice of law applies.

b. The Existence of a Contract

As the party seeking to compel arbitration, Bulk Trading bears "'the initial burden of proving the existence of a contract calling for arbitration and providing that the contract evidences a transaction substantially affecting interstate commerce.'" *Lyles v. Pioneer Housing Sys., Inc.*,   858 So. 2d 226, 228 (Ala. 2003) (quoting *American Gen. Fin., Inc. v. Morton*, 812 So. 2d 282, 284-85 (Ala. 2001)).  As noted above, Vulcan Coal acknowledges that it signed the document relied upon, but claims that in signing it, Hudson made clear that no contract would

13

exist unless and until Crimson Minerals also signed it.   Vulcan Coal now argues that no contract

exists because Crimson Minerals did not sign it:  the document has three signature lines, one of

which is for Crimson Materials, but Crimson Materials did not receive the contract, did not sign

it, and did not otherwise assent to it.  The court notes that the proposed contract also contains a

signature line for Bulk Trading but no signature of its representative.

Under Alabama law, a contract does not have to be signed to be enforceable.  *Merrill,*

*Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore,* 751 So. 2d 8, 11 (Ala. 1999).  "'The object of a

signature on a contract is to show mutuality and assent, and that mutuality and assent can be

manifested in ways other than a signature.'" *Cook's Pest Control v. Rebar*, 852 So. 2d 730, 738

(Ala. 2003) (quoting *Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260, 1262 (Ala. 1983)).  "However,

while it is well-settled that a signature is not necessary for the formation of a contract, 'an

unsigned contract cannot be enforced by either of the parties, however completely it may express

their mutual agreement, if it was also agreed that the contract should not be binding until signed

by both of them.'"  *Mercedes-Benz U.S. Intern., Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189,

1204 (N.D. Ala. 2009) (quoting *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813-14 (Ala.

2005)).

Vulcan Coal points to a number of affidavits stating that Hudson of Vulcan Coal insisted

that Crimson Minerals, as the coal supplier, be a party to the contract.  *See* Hudson Affidavit

(doc. 11-1, at 3-4); Dailey Affidavit (doc. 11-1, at 15); Uncein Affidavit (doc. 11-1, at 18);

Chamblee Affidavit (doc. 11-1, at 21).  Opposing declarations state that the contract was *not*

conditioned upon Crimson Minerals' signature, and thus, those declarations create a question of

fact. *See* Cairo Declaration (doc. 14, Ex. A, at 2-3); Schneider Declaration (doc. 14, Ex. B, at 2-

3).  Having acknowledged a question of fact, the court also acknowledges that the evidence

supporting Vulcan Coal's position is plausible and substantial.  For example, an early draft of the

proposed agreement did not include Crimson Minerals' name, but the subsequent document *that*

*Bulk Trading relies upon* does include Crimson Minerals' name, refers to both Vulcan Coal and

Crimson Minerals as the "Seller," and includes a signature line for Crimson Minerals.  That

change corresponds with and appears to confirm the statement in the affidavits of Hudson,

Dailey, and Uncein that Vulcan Coal *insisted* Crimson Minerals be added as an essential party to

the contract.

Further, the emails submitted as evidence reflect direct communication between Scott

Chamblee of Crimson Minerals and Hernando Schneider of  ProTCon, who eventually served as

Bulk Trading representative for the coal supply deal.  In late January 2011, Schneider

corresponded directly with Chamblee about the coal to be supplied.  In early March of 2011,

Schneider, representing Bulk Trading, copied Chamblee of Crimson Minerals on an email,

acknowledging that "Scott [Chamblee] is in charge" of providing certain tonnage of coal and

indicating that he would communicate with Chamblee directly about certain questions.  (Doc. 14,

Ex. I).  In an email dated March 3, 2011, Chamblee communicated directly with Schneider about

loading coal onto barges, instead of communicating through Vulcan Coal.  While not

determinative in isolation, these emails provide further support for Vulcan Coal's position that

Crimson Minerals was an essential party working directly with Bulk Trading.  They provide

little, if any, support for Bulk Trading's position that Crimson Minerals was a third party to the

"contract," and that the coal supply arrangement was private to Vulcan Coal and Crimson

Minerals and separate from the contract between Bulk Trading and Vulcan Coal.

15

Bulk Trading insists that Vulcan Coal's signature on the "contract," coupled with the March 2011 coal shipments, manifests the intent of the parties that the document represent a binding contract.  As Bulk Trading points out, the Alabama version of the Uniform Commercial Code provides in pertinent part that "[a] contract for sale of good may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Ala. Code § 7-2-204(1).

However, the correspondence between Vulcan Coal and Bulk Trading, including an email written by Bulk Trading's own manager, refers to the March 2011 shipments as  "trial" shipments rather than performance pursuant to the contract.  *See* email chain between Schneider, Chamblee, Hudson and Uncein dated 3/2/11-3/4/11 with the subject "lynnport trial" (doc. 14, Ex. I); Hudson email to Schneider and Dailey dated 3/21/11 (doc. 14, Ex. F); Cairo email to Hudson, Schneider, Sanchez, Mejia, and Uncein dated 4/7/11 (doc. 11-1, at 24).  This reference to "trial" could refer to the one-week trial shipment referenced in paragraph one of the "contract" to occur March 11-17, 2011.  Yet, because the actual "trial shipments" began on March 3-4, 2011 and continued throughout that month, the actual trial shipments do not appear to conform to the one week mid-March shipment stated in the contract.  Further, in Hudson's March 14, 2011 email to Schneider, Dailey, and Uncein, he explicitly states that "*we do not have a completed contract*." (Doc. 14, Ex. D) (emphasis added).  Thus, during the very month Bulk Trading claims that Vulcan Coal was performing under the contract, Vulcan Coal instead took the same position it holds now: that no contract existed.  If Bulk Trading truly believed in March of 2011 that a contract existed, the court finds curious the fact that it did not respond to the March 14 email, asking "What do you mean we do not have a completed contract?"

16

Bulk Trading points to the email of Hudson to Schneider dated February 9, 2011, two days before Hudson signed the "contract," stating "I have an agreement with Scott and Crimson Mineral and will get that executed tomorrow at our lawyers office and then get ours sent out to you and BT." This email does reference an agreement between Vulcan Coal and Crimson Mineral, but the court does not agree that the reference to that agreement means that Crimson Materials was not an essential party to the "contract" at issue and that the "contract" at issue was effective without Crimson Minerals' execution of it.

As further evidence manifesting the parties' intentions, Bulk Trading also provides a June 2011 email of Cairo referring to "bad performance of the contract." (Doc. 14, Ex. G). This email also provides "formal notice" to Vulcan Coal that Bulk Trading will "take whatsoever steps we deem necessary to duly secure our claim and recover the capital amount plus interests in costs." *Id.* In other words, the first time Bulk Trading specifically characterizes the coal supply matter as an executed contract, that characterization is in connection with a threat to file formal claims. Vulcan Coal filed suit only a few days later. Because of the timing of this email, the court does not find it to be particularly helpful as a manifestation of the parties' intentions at the time Bulk Trading claims the contract was made.

Finally, Bulk Trading argues that even if the parties had agreed that Crimson Minerals' signature on the "contract" were required, and thus, no contract existed initially, Crimson Minerals' subsequent actions ratified the contract. As noted previously, Crimson Materials' direct involvement with Bulk Trading would also support Vulcan Coal's argument that Crimson Materials was an essential party to the contract, but that without its signature, no contract existed, and that the subsequent coal activity occurred as an unsatisfactory trial shipment that never

17

resulted in a binding contract.

In sum, to support its motion to stay and compel arbitration, Bulk Trading has the burden of proving that a valid contract exists containing an arbitration clause.  It has not done so. Evidence exists to support both parties' positions, and substantial evidence supports Vulcan's Coal's position about the preliminary nature of the agreement and reflects that the deal fell through without being finalized.  Because Bulk Trading has not met its burden, the court finds that the motion to stay and compel arbitration is due to be DENIED.

### CONCLUSION

For the reasons stated above, the court finds the motion to strike is due to be DENIED and the motion to stay and compel arbitration is likewise due to be DENIED.

Simultaneously with this Memorandum Opinion, the court will enter a separate, consistent Order.

Dated this 1st day of April, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE